IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA

Plaintiff

vs

**MARIA DE LOS ANGELES RIVERA-RANGEL**, a/k/a Angie
ANGEL LUIS OCASIO-RAMOS

Defendants

CRIMINAL 02-0098CCC

# O R D E R

This action was remanded by the Court of Appeals for resentencing consistent with the procedure established in United States v. Jiménez-Beltre, 440 F.3d 514 (1st Cir. 2006). As explained in Jiménez-Beltre, the first step in sentencing under the advisory guidelines regime requires us to calculate the applicable guideline range. Id., at p. 518. In order to start that process, we now make specific rulings on the objections to the Presentence Report (PSR) filed by defendant María de los Angeles Rivera-Rangel (**docket entry 178**) since May 2005[1] which, although duly considered before imposing the original sentence as part of our analysis of the relevant sentencing factors established in 18 U.S.C. §3553 (see docket entry 180), were not then explicitly addressed and disposed.

Defendant has challenged two adjustments awarded to her under the advisory sentencing guidelines. She contends that an upward adjustment of eight (8) levels under U.S.S.G. §2C1.1(b)(2)(B) based on the offense involving a payment "for the purpose of influencing an elected official or any official holding a high-level decision-making or sensitive position" is inapplicable as "the alleged payments were not made to influence any public official." Defendant's Objections, at p. 10. Defendant avers that the trial evidence showed that she could not influence the decision of the public officials that she called on behalf of the bribe-paying businessmen, and that they all knew that. She also objects said adjustment, as well as a two-level

---

[1] While the United States also filed objections to the Presentence Report (PSR) (**docket entry 175**), in light of the Joint Motion Recommending Sentence filed by the parties on February 27, 2007 (docket entry 234) the Court deemed them withdrawn. See docket entry 235.

CRIMINAL 02-0098CCC                           2

upward adjustment under U.S.S.G. §2C1.1(b)(1) (for the offense involving more than one bribe) on Fifth and Sixth Amendment grounds, asserting that the facts needed to support both enhancements were not submitted to the jury nor proven beyond a reasonable doubt and that their application would increase her sentence based on judicial factual findings under a preponderance of the evidence standard in violation of both Amendments.  The United States never responded to defendant's objections.

As to the upward adjustment of eight (8) levels under U.S.S.G. §2C1.1(b)(2)(B), we find that it is clearly warranted by the evidence presented at trial.  Section §2C1.1(b)(2)(B) of the Guidelines instructs a trial court to apply an eight-level enhancement "[i]f the offense involved a payment for the purpose of influencing an elected official or any official holding a high-level decision-making or sensitive position...."  Defendant averred that the trial evidence showed that she could not influence the decision of the public officials that she called on behalf of the bribe-paying businessmen, and that they all knew that.  She downplayed her actions as being limited to calling agency heads to get appointments.  The analysis of the trial evidence conducted by the Court of Appeals defeats these arguments, as reflected in the following excerpts of its Opinion dated October 25, 2006, <u>United States v. Rivera-Rangel</u>, 396 F.3d 476 (1st Cir. 2005), where the Court found:

(1)   On several occasions in 1997, Ventura asked for Rivera's help, and she responded by calling government officials and arranging meetings between the officials and Ventura or asking the officials "to try to help [him] out." Government officials were receptive to Rivera because, as one official explained, "she was the assistant to the Governor, . . . and [they] expect[ed] that all the calls that she made . . . were on behalf of the Governor.

<u>Id.</u>, at p. 480-81.

(2)   In addition to setting up meetings between the contractors and government officials, Rivera would also call officials to expedite matters for the contractors, including the payment of invoices and the relaxation of construction requirements.

<u>Id.</u>, at p. 481, n. 4.

(3)   Ocasio, who by 1999 had already been paying Rivera on a regular basis for her assistance for several years, explained that he did so because, after he left his government position, he did not have influence over government officials and she wielded tremendous influence.  In fact, he stated that "[a]ny phone call coming in from her was construed as having the support of [the Governor] . . ." Ocasio

CRIMINAL 02-0098CCC                                3

>           likened Rivera's power within the government to that of "a bull dozer . . . that [could] just take out anything that is [i]n its way," and he testified that she helped him obtain government contracts by "mak[ing] phone calls to [government officials] to facilitate the process."

Id., at p. 481, n. 5.

(4)     The fact that Ventura reluctantly agreed to pay Rivera an additional $1,500 per month in 1999 further supports the finding that Ventura acted out of a fear of economic loss and that this was "not a situation . . . in which [Ventura] w[as] merely attempting to obtain preferential access and thought that, even without the payments, [he] would have a fair opportunity to [obtain permits]." (citations omitted)

>        . . . given Rivera's access to, and influence over, the official who decided whether to grant the permits Ventura needed, we cannot say that Ventura's fear was unreasonable.

Id., at p. 483-484.

(5)     We note that it is irrelevant that Rivera lacked (and that Ventura knew she lacked) the ultimate authority to issue permits or otherwise affect his government business; Rivera, in her official capacity, had the power to facilitate Ventura's government business, and it was that power that Ventura paid her to exercise. (citations omitted) "Actual authority over the end result . . . is not controlling if [defendant], through his official position, had influence and authority over a means to that end.") (Citations omitted.)

Id., at p. 485.

Defendant, then, not only arranged meetings for the contractors as she claimed, but also called the officials to expedite matters for the contractors, was described as wielding tremendous influence, and compared to a bulldozer for her ability to take things out of the way. Given that through her official position she had the power to facilitate the business of the extorted contractors with the government, that she was paid by the contractors for her to exercise that power, and that it is undisputed that most of the persons over whom she exercised her influence were heads of agencies of the Commonwealth, it is patently evident that "the offense involved a payment for the purpose of influencing an official holding a high-level decision-making or sensitive position" requiring the application of the eight-level upward adjustment under U.S.S.G. §2C1.1(b)(2)(B).

CRIMINAL 02-0098CCC                                  4

Defendant's blanket objection to the two-upward adjustments applied to her under the advisory guidelines for not having been submitted to the jury nor proven beyond a reasonable doubt and being based on judicial factual finding under a preponderance of the evidence standard is frivolous in the aftermath of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).  It is true that the Sixth Amendment requires jurors to determine facts that are necessary to the imposition of a certain sentence, see Booker, 125 S.Ct. at 748-50 (discussing Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000) and Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004)), but upon determining that the sentencing guidelines suffered from this flaw, the Booker Court opted to cure it by invalidating those provisions of the Sentencing Reform Act that made the guidelines mandatory.  See id. at 764-65.  Thus, "[a]s a result of the Remedy Opinion in Booker/Fanfan, . . . the maximum lawful sentence is the statutory maximum sentence, and because judicial fact-finding under advisory guidelines cannot increase that lawful maximum, judicial fact-finding now encounters no Sixth Amendment difficulties." United States v. Antonakopoulos, 399 F.3d 68, 79 (1st Cir.2005) (quoting United States v. Crosby, 397 F.3d 103, 109 n. 6, (2d Cir.2005)).  While defendant contends that in Shepard v. United States, 544 U.S. 13, 125 S.Ct. 1254 (2005) the Court ruled that disputed facts on all sentencing issues must be presented to a jury and the jury must make its findings beyond a reasonable doubt, we read Shepard's plurality opinion (Part III of the Opinion) as holding only that Sixth Amendment protections apply to disputed facts about a prior conviction that are not evident from "the conclusive significance of a prior judicial record," id. at 24-26, and, therefore, an

> . . . enquiry under the ACCA [Armed Career Criminal Act] to determine whether a plea of guilty to burglary defined by a nongeneric statute necessarily admitted elements of the generic offense is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to sor

Id., at 26.

In any event, and as the Court of Appeals has observed, "[w]hatever the scope of Shepard, it does not overrule Booker." United States v. Gonsalves, 435 F.3d 64, 72 (1st Cir. 2006).

CRIMINAL 02-0098CCC 5

In sum, both of defendant's objections to the upward adjustments awarded to her in the PSR are OVERRULED. As a result of our findings today, defendant's total offense level under the sentencing guidelines remains at 20, which coupled with a Criminal History Category of I results in an advisory guideline sentencing range of 33 to 41 months.

SO ORDERED.

At San Juan, Puerto Rico, on February 28, 2007.

S/CARMEN CONSUELO CEREZO
United States District Judge